IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
Southern Division

NOREEN FRANK,                          *

    Plaintiff,                         *          Case No.: GJH-15-124

                                       *

v.                                     *

LIBERTY LIFE ASSURANCE                 *
COMPANY OF BOSTON,
                                       *
    Defendant.                         *

*    *    *    *    *    *    *    *    *    *    *    *    *

## MEMORANDUM OPINION

    Plaintiff Noreen Frank brings this case against Liberty Life Assurance Company of Boston ("Liberty") under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. § 1132(a)(1), alleging wrongful denial of benefits stemming from Liberty's termination of Frank's long-term disability ("LTD") benefits. Pending before the Court are cross-motions for judgment, filed by the Plaintiff, ECF No. 53, and the Defendant, ECF No. 59. These issues have been fully briefed and a hearing is unnecessary. Loc. R. 105.6 (D. Md. 2016). For the reasons stated below, the Court will deny Plaintiff's Motion for Judgment and grant Defendant's Motion for Judgment.

## I.    BACKGROUND

    Frank initiated this action on January 15, 2015, asserting claims against Liberty as well as Sodexo, Inc. ("Sodexo") and Sodexo Long Term Disability Plan ("Sodexo Plan") for violations of ERISA due to Liberty's denial of Frank's LTD benefits. *See generally* ECF No. 1.[1]

---

[1] The initial Complaint also stated claims for relief pursuant to 29 U.S.C. § 1132(a)(3), which allows for injunctive or other equitable relief. However, those claims were eliminated at the motion to dismiss stage when

Defendants Sodexo and Sodexo Plan filed a joint Motion to Dismiss, ECF No. 14, which the Court granted on December 3, 2015. *See Frank v. Liberty Life Assurance Co. of Boston*, 149 F. Supp. 3d 566 (D. Md. 2015) (hereinafter, "Frank I"). In the same opinion, the Court granted Plaintiff's Motion for Partial Summary Judgment regarding the appropriate standard of review, determining that the Court would review the plan administrator's decision to deny LTD benefits *de novo. Id.* at 576. On February 1, 2016, the Court granted Plaintiff's Motion for Leave to Conduct Limited Discovery regarding Gale G. Brown, Jr., M.D., a doctor whose analysis of Frank's condition Liberty relied on in making their benefits determination. ECF No. 48. After the close of discovery, the parties submitted cross-motions for judgment which have been fully briefed. ECF Nos. 53, 58, 65 & 68. On November 4, 2016, Plaintiff filed a Supplemental to its Motion for Judgment, ECF No. 69, regarding a recent decision in an ERISA denial of benefits case by a neighboring district court, and Defendant filed a response distinguishing the case, ECF No. 70.

Frank seeks reinstatement of benefits from the date of termination, December 30, 2013, until she reaches the age of 65 or is determined to be no longer eligible for benefits under the terms of the Policy. ECF No. 53-1 at 47-48.[2] Plaintiff also requests attorney's fees and costs associated with the litigation of this case. *Id.* at 48.

## II.    STANDARD OF REVIEW

The Court has previously determined that it must review the plan administrator's decision under a *de novo* standard. *See Frank I,* at 576. "When reviewing a benefits denial *de novo*, the Court's 'job is to make [its] own independent determination of whether [the claimant] was

---

Defendants Sodexo and Sodexo Plan were dismissed from the case. *See* ECF No. 1 at 26 (requesting injunction and equitable relief against Sodexo).

[2] Pin cites to documents filed on the Court's electronic filing system (CM/ECF) refer to the page numbers generated by that system.

entitled to the ... benefits. The correctness, not the reasonableness, of [the] denial of ... benefits is [the Court's] only concern ...'" *Weisner v. Liberty Life Assurance Co. of Boston*, 192 F. Supp. 3d 601, 613 (D. Md. 2016) (quoting *Johnson v. Am. United Life Ins. Co.*, 716 F.3d 813, 819 (4th Cir. 2013)). Thus, "the task for a district court is to 'consider the issue of whether the plaintiff is entitled to disability benefits as if it had not been decided previously.'" *Neumann v. Prudential Ins. Co. of Am.*, 367 F. Supp. 2d 969, 988 (E.D. Va. 2005) (quoting *Hughes v. Prudential Life Ins. Co. of Am.*, 2005 WL 839924, at *5, 2005 U.S. Dist. LEXIS 6188, at *13 (W.D. Va. 2005)). In doing so, the Court may, in its discretion, consider evidence outside of the evidentiary record that was presented to the claim administrator if the court "finds that additional evidence is necessary for resolution of the benefit claim." *Quesinberry v. Life Ins. Co. of Am.*, 987 F.2d 1017, 1026-27 (4th Cir. 1993). "[I]ssues regarding the credibility of medical experts" are among the concerns that may warrant allowing additional evidence. *Id.* at 1027. To prevail on a challenge of denial of benefits, the plaintiff has the burden of proof and must show that she submitted sufficient evidence, in accordance with the requirements of the Policy, to show that she was disabled within the meaning of the Policy. *See Gallagher v. Reliance Standard Life Ins. Co.*, 305 F.3d 264, 276 (4th Cir. 2002).

Having established the standard of review, the Court must next determine the correct procedural posture of the case. The parties jointly request that the Court analyze the pending motions via a bench trial on the papers pursuant to Rule 52(a), rather than under the summary judgment standard of Rule 56. *See* Fed. R. Civ. Pro. 52(a); 56; *see also* ECF Nos. 65 at 1 and 68 at 1. Summary judgment is appropriate if "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations ..., admissions, interrogatory answers, or other materials," Fed. R. Civ. P. 56(c), show that there is

"no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). When ruling on a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). In contrast, when deciding an action pursuant to Rule 52(a), "the judge sits as finder of fact and is empowered to evaluate the evidence, determine the credibility of witnesses, and draw whatever reasonable inferences the judge deems appropriate given his factual findings." *Weisner*, 192 F. Supp. 3d at 608 (citing *Inv'rs Title Ins. Co. v. Bair*, 296 F. App'x 332, 333 (4th Cir. 2008) (per curiam)).

While the Fourth Circuit has not yet opined on the proper approach to evaluating denial of benefit claims under *de novo* review, other courts in this district have done so pursuant to Rule 52, *see Neumann*, 367 F. Supp. 2d at 978-980, or suggested that such an approach would be proper. *See, e.g.*, *Weisner*, 192 F. Supp. 3d at 608 ("While courts sitting in this Circuit continue to resolve straightforward ERISA cases on summary judgment, courts alternatively invoke Rule 52 (governing actions tried on the facts without a jury) in cases in which material facts remain in dispute or in which the court must weigh the evidence and make credibility determinations in order to reach a just result."); *Horton v. Life Ins. Co. of N. Am.*, No. CIV.A. ELH-14-3, 2015 WL 1469196, at *13 (D. Md. Mar. 30, 2015) (reasoning that, "in the absence of explicit Fourth Circuit guidance rejecting Rule 56 as a valid standard upon which to evaluate a…ERISA claim, [it] may well be appropriate, so long as the court is satisfied that there is no *genuine dispute of material fact*. In the event of a material dispute of fact, however, resolution under Rule 52 appears appropriate.") (emphasis in original)). District Courts that have commented that resolution under Rule 52 is inappropriate have done so in the context of reviewing an

administrator's decision under an abuse of discretion standard, where a court's independent fact finding would be "inappropriate and in derogation of the required deference." *Tobey v. Keiter, Stephens. Hurst, Gary & Shreaves*, No. 3:13-CV-315, 2014 WL 61325, at \*3 n.2 (E.D. Va. Jan. 7, 2014), aff'd, 585 F. App'x 837 (4th Cir. 2014). The Court finds that where, as is the case here, the Court is conducting a *de novo* review of a denial of benefits, and the record contains a multitude of disputed facts, resolution of the case under Rule 52 is the appropriate analytical route.

Rule 52(a)(1) provides, in relevant part, that "[i]n an action tried on the facts without a jury . . . , the court must find the facts specially and state its conclusions of law separately. The findings and conclusions . . . may appear in an opinion or a memorandum of decision filed by the court." To comply with this rule, the court "need only make brief, definite, pertinent findings and conclusions upon the contested matters, as there is no need for overelaboration of detail or particularization of facts." *Wooten v. Lightburn*, 579 F. Supp. 2d 769, 772 (W.D. Va. 2008) (citing Notes of Advisory Committee on 1946 Amendments); *see also Sherwin-Williams Co. v. Coach Works Auto Collision Repair Center Inc.*, Civ. Action No. WMN-07-2918, 2012 WL 2343235, at \*5 (D. Md. June 19, 2012) ("Rule 52(a) 'does not require the court to make findings on all facts presented or to make detailed evidentiary findings; if the findings are sufficient to support the ultimate conclusion of the court they are sufficient.'") (quoting *Darter v. Greenville Comm. Hotel Corp.*, 301 F.2d 70, 75 (4th Cir. 1962)).

## III.   FINDINGS OF FACT

### A.  Frank's Occupation

Frank was formerly employed as the Director of Human Resources at Sodexo. E.R. 552.[3]
In that role, she "managed human relations issues for a segment of the business," which included
designing, implementing and managing human relation programs; ensuring compliance with
applicable policies and regulations; and managing aspects of human relations administration
including payroll and benefits. *Id.* The position required an individual to be proficient in tasks
such as managing finances, project oversight and management, talent management and strategic
leadership. *Id.*

As part of its review of Frank's disability claim, Liberty requested an Occupational
Analysis from Ellen Levine, M.S., C.R.C., C.C.M., to determine the physical demands of
Frank's occupation. E.R. 543. Levine reviewed Frank's job description and determined that her
job tasks were best classified as "Manager, Personnel" in the Dictionary of Occupational Titles
("DOT"), "Human Resource Manager" under the Standard Occupational Classification
/Occupational Information Network("SOC/O*NET") classification, or "Human Resources
Manager" under the Occupational Outlook Handbook ("OOH"). E.R. 544-45. The SOC/O*NET
classification describes the occupation of "Human Resource Manager" as "plan[ing], direct[ing],
or coordinat[ing] human resources activities and staff of an organization" and as an occupation
that may be identified with job titles such as Director of Human Resources, Human Resources
Manager, or Human Resources Vice President. E.R. 544. [4] The OOH description of this
occupation further notes that individuals in this role "oversee the recruiting, interviewing, and

---

[3] The Court will refer to the insurance policy and claim review file as the "Evidentiary Record" or "E.R."
Due to their voluminous size, a hard copy has been filed under seal with the Clerk's office. *See* ECF No. 35-1,
Exhibit A.

[4] The DOT classification was "substantially similar to the SOC/O*NET description." E.R. 544.

6

hiring of new staff, consult with top executives on strategic planning; and serve as a link between

an organization's management and its employees." E.R. 545. Additionally, some managers,

especially of national corporations, must travel to visit other branches of the company, to recruit

potential new hires, and to attend professional meetings. *Id.* Based on these descriptions, Levine

opines that "the typical physical demands of Ms. Frank's occupation of Human Resources

Managers are most often sedentary and light in physical demand" based on the Department of

Labor's definition of "sedentary" and "light" work, with opportunities available at both levels.

E.R. 546.

The Department of Labor's definitions, included in the analysis, state that "sedentary

work" involves "sitting most of the time, but may involve walking or standing for brief periods

of time. Jobs are sedentary if walking and standing are required only occasionally and all other

sedentary criteria are met." E.R. 545-46. "Light work" is defined, in relevant part, as requiring

physical demands in excess of those for Sedentary Work, noting,

> [e]ven though the weight lifted may be only a negligible amount, a job should be
> rated Light Work: (1) when it requires walking or standing to a significant degree;
> or (2) when it requires sitting most of the time but entails pushing and/or pulling
> of arm or leg controls; and/or (3) when the job requires working at a production
> rate pace entailing the constant pushing and/or pulling of materials even though
> the weight of those materials is negligible.

E.R. 546.

### B. The Policy

Liberty issued a Group Disability Income Policy ("Policy") to Sodexo effective January

1, 2005. E.R. 1. The Policy, which is governed by ERISA, includes both short-term and long-

term disability benefits. *Id.* For individuals, such as Plaintiff, who were less than 60 when the

disability began, the benefit period for LTD benefits, the only type at issue in this litigation, ends

upon the claimant's 65th birthday. E.R. 8.; *see also* E.R. 559 (listing dating of birth of Plaintiff).

With respect to long-term disability, the Policy defined "disabled" as follows:

    i.      "Disability" or "Disabled" means that during the Elimination Period[5] and the next 24 months of Disability the Covered Person, as a result of Injury or Sickness, is unable to perform the Material and Substantial Duties of his Own Occupation; and

    ii.     thereafter, the Covered Person is unable to perform, with reasonable continuity, the Material and Substantial Duties of Any Occupation.

E.R. 11.

"Material and substantial duties" are further defined in the Policy as "the responsibilities that are normally required to perform the Covered Person's Own Occupation and cannot be reasonably eliminated or modified." E.R. 13. After 24 months, a claimant's "Maximum Own Occupation period" ends and the applicable definition changes to whether the claimant can perform "the responsibilities that are normally required to perform the Covered Person's Own Occupation, *or any other occupation*, and cannot be reasonably eliminated or modified." *Id.* (emphasis added); *see also* E.R. 7. A claimant's "Own Occupation" is "not limited to his job with his Employer" and is instead defined as "the Covered Person's employment, business, trade or profession involving Material and Substantial Duties of the same general character as his regular and ordinary employment he was performing when his Disability or Partial Disability began." E.R. 13.

To receive LTD benefits under this Policy, a claimant is required to submit proof of their disability. E.R. 29. "Proof" is defined as "written proof covering the occurrence, the character and the extent of the loss for which the claim is made." E.R. 14. Such proof may include

    1)  a claim form completed and signed (or otherwise formally submitted) by the Covered Person claiming benefits;

    2)  an attending Physician's statement completed and signed (or otherwise formally submitted) by the Covered Person's attending Physician; and

---

    [5] The Elimination Period is defined as "a period of consecutive days of Disability for which no benefit is payable." E.R. 11.

     3) the provision by the attending Physician of standard diagnosis, chart notes, lab findings, test results, x-rays and/or other forms of objective medical evidence in support of a claim for benefits.

*Id.*

Upon receipt of this proof, Liberty will begin to pay the claimant a monthly benefit, and will continue to pay the benefit through the maximum period of disability upon receipt of proof of continued disability, "regular attendance of a physician" and receipt of appropriate available treatment. E.R. 29. Finally, the Policy details various events that could trigger the termination of benefits, including claimant's decision not to work in his Own Occupation on a part-time basis, despite the ability to do so; claimant's refusal to work in his Own Occupation in a job with the Sponsor, here Sodexo, where workplace modifications or accommodations were made; claimant's refusal to receive appropriate medical treatment; or a determination that the claimant no longer meets the Policy's definition of disability. E.R. 37-38.

### C. Frank's Medical Condition & Application for LTD Benefits

On November 12, 2012, Frank visited Dr. Sheldon Mandel, an orthopedic specialist, complaining of acute pain in her back and left leg, describing her pain as "10/10 sharp, throbbing." E.R. 964-65. During the visit she reported having a lumbar laminectomy in 2008, a procedure where a portion of one's vertebra in their lower back is removed to alleviate pain in the spinal canal.[6] E.R. 964. She also explained that she had recently been working long hours, sitting 6 to 12 hours a day and driving to and from work. *Id.* After a physical examination, Dr. Mandel listed a diagnosis of post-laminectomy syndrome with pain, and prescribed a steroid, Metrol Dosepak,[7] 5 mg of oxycodone, and 10 mg of Flexeril,[8] a muscle relaxant. E.R. 964-65. Frank returned to see Dr. Mandel on November 26, 2012. E.R. 935. Dr. Mandel conducted a

---

[6] MayoClinic, "Laminectomy" (Sept. 3, 2015) http://www.mayoclinic.org/tests-procedures/laminectomy/basics/definition/prc-20009521.

[7] CVS.com, "Metrol Dosepak" http://www.cvs.com/drug/medrol-dosepak (last accessed February 9, 2017).

[8] CVS.com, "Flexeril" http://www.cvs.com/drug/flexeril/oral-tablet/10mg (last accessed February 9, 2017).

physical examination, noting that Frank has "almost no lumbar motion with exquisite pain on attempted motion." *Id.* Her self-reported pain was 9/10, and the doctor decided to request a MRI, have Frank stay home from work and begin physical therapy. *Id.* His diagnosis at this time changed to acute lumbar radiculitis. *Id.* She returned to see Dr. Mandel on December 6, 2012, this time describing severe pain in her right leg, rather than her left, rating it 9/10. E.R. 903. Dr. Mandel noted that the MRI showed "changes in the L5-S1 region" and the region of her previous surgery. *Id.*[9] He prescribed a continued regimen of physical therapy, pain medication, and muscle relaxants, and said that she should be off work until the beginning of January 2013. *Id.*

These issues led Frank to apply to Liberty for LTD benefits on December 6, 2012. E.R. 915-19. As part of her claim, Frank completed an "Activities Questionnaire" listing her ability to complete normal activities of daily life. E.R. 910-13. In the questionnaire, Frank stated that she could sit for "about 20 min[utes] at a time," could stand for "about 30 min[utes] at a time" and could walk "30 min[utes] – 1 h[our] (depending) at a time." E.R. 910. She also reported being able to run errands, such as grocery shopping and going to medical appointments, approximately four times a week. *Id.* She reported having severe pain in her lower back that radiated down her leg, especially when sitting for longer than 20 minutes, which prevented her from engaging in any gainful employment. E.R. 913. She also reported fatigue and headaches due to lack of sleep, as well as complications with her medicine, resulting in an inability to concentrate at times. *Id.*

On December 17, 2012, Liberty informed Frank that she was eligible to receive LTD benefits and began paying them to her with an effective date of December 9, 2012. E.R. 876-77. The letter indicated that Liberty would continue to review her claim and request medical documentation to support her continued disability. E.R. 878. As part of the review process, Liberty contracted with a private company to conduct video surveillance of Frank. E.R. 734.

---

[9] The MRI report itself can be found at E.R. 886-87.

Investigative reports reflect 18 days of surveillance between March and September 2013. E.R. 709-43; 640-49. Five video clips of this surveillance were submitted to the Court, and show a portion of Frank's daily activities on April 25, 2013, April 27, 2013, May 17-18, 2013, September 10-11, 2013 and September 13, 2013. ECF No. 35-1, Exhibit B.[10] In the videos, Frank is seen walking to and from her car, walking her dog, and watering her garden. *Id.* On the clip from April 27, 2013, Frank is observed walking her dog for approximately 40 minutes, and is seen throwing a Frisbee to her dog. *Id.* According to the investigator's report, the route she took for her walk that day was approximately 1.4 miles. E.R. 729. In the clips, Frank appears to walk at a normal, if stiff, gait and does not use any support, such as a cane or walker, for assistance. In several clips, Frank is seen bending down, though with her knees bent. In the video clip at the shopping center taken on April 25, 2013, Frank appears to slowly lower herself into the car.

After surveillance was completed, Frank's file was referred to Dr. Gale Brown, Jr., a specialist in physical medicine and rehabilitation, for review. E.R. 548-49. Liberty asked Dr. Brown to assess what physical diagnosis, if any, was supported by the medical evidence in Frank's file, and to determine whether medical evidence supports "an inability to sustain work at a sedentary capacity for an eight hour day." E.R. 549-50. In her report, dated December 10, 2013, Dr. Brown noted that she had reviewed the occupational analysis and activities questionnaire discussed above; investigative reports, including video, from surveillance that Liberty had conducted on Frank; notes from Frank's treating physicians, including Dr. Sheldon Mandel, Dr. Madhavi Hubbly and Dr. Moshin Sheikh regarding their treatment of Frank from November 12, 2012 through September 12, 2013; and diagnostic test results. E.R. 536. Based on the information before her, Dr. Brown concluded that "the reviewed medical and functional documentation does not support functional impairment related to the insured's chronic low back

---

[10] Six video clips were on the DVD provided by Defendant but one clip is a duplicate.

and lower extremity complaints..." and that "the insured remains physically capable of full-time sedentary and light-work, as defined by the US Department of Labor." E.R. 537. She further found that, aside from effects on her intestinal system, there were no confirmed functional or cognitive limitations due to her medication use. *Id.*

Dr. Brown recommended reaching out to the doctors who were treating Frank, Dr. Hubbly (Primary Care) and Dr. Sheikh (Pain Management) for their opinion regarding her work capacity, and recommended an independent medical evaluation if either provider thought Frank was capable of working. E.R. 537. Dr. Brown noted that there was no indication that Dr. Mandel, who had initially treated Frank and had opined that she was permanently disabled, had treated her since March 2013. E.R. 538.[11] Dr. Brown called Dr. Sheikh on December 12, 2013, and faxed him a letter, summarizing the discussion they had that day. E.R. 504. She indicated that she would be providing Dr. Sheikh with the surveillance videos, per his request, so he could view the evidence himself and reach his own conclusions. *Id.* On December 12, 2013, Dr. Brown sent a fax to Dr. Hubbly summarizing their conversation on December 11, 2013, but Dr. Hubbly did not reply or acknowledge the veracity of her summary of their interaction. E.R. 522-24.

In a letter dated January 20, 2014, Liberty terminated Plaintiff's LTD benefits, effective December 31, 2013, due to her failure to continue to meet the Policy's definition of disability. E.R. 506-10. In reaching their decision, Liberty noted that they reviewed medical records from Frank's treating physicians, including Dr. Mandel and Dr. Hubbly, regarding their treatment of Frank; surveillance footage of Frank from April 2013 - September 2013; Dr. Brown's assessment; and the Occupation Analysis conducted by Ms. Levine. E.R. 507-09. Liberty also stated that Dr. Brown faxed letters to Drs. Hubbly and Sheikh to discuss her claim, and that no

---

[11] Frank appears to have continued to see Dr. Mandel until at least November 13, 2013, E.R. 213, but it is unclear if records from those appointments were presented to Dr. Brown.

responses were received. E.R. 508. Based on this review, Liberty stated that "the medical evidence reviewed does not support any impairments, restrictions, or limitations which would preclude you from performing your own occupation as a Human Resources Manager." E.R. 509. The letter specifically highlighted the surveillance record which showed Frank "walking a dog up to 1.4 miles on multiple days…" and noted that Dr. Brown had opined that "permanent disability, as previously offered by Dr. Mandel in March 2013, is not medically supported or consistent with the insured's demonstrated functional abilities on surveillance." E.R. 507. Liberty ended the letter noting that Frank could submit a written request for review within 180 days. E.R. 509.

On January 23, 2014, Dr. Sheikh sent his response to Dr. Brown's letter. E.R. 504. He indicated that Frank could not perform full-time sedentary work, even with allowance for position change. *Id.* He stated that "she was unable to do [full-time sedentary work] at this time due to chronic pain which does not allow her to sit. Also difficulty concentrating due to chronic pain and side effects from medication which she needs to take." *Id.* He recommended that she avoid prolonged sitting, heavy lifting and excessive bending or twisting. *Id.* Finally, he noted that Frank's pain was "somewhat controlled" at this time but "still functionally limiting." *Id.*

Based on Dr. Sheikh's response, Dr. Brown filed a new report on January 27, 2014.[12] E.R. 499-500. In that report, she repeated her conclusion that Frank could "perform full time sedentary work, including the essential duties of her occupation, with allowance for position change [sit/stand/sit]…." E.R. 500. She reiterated her argument that Dr. Sheikh provided "no functional or medical evidence" to support his opinion that Frank could not perform work and no

---

[12] This report indicated that Dr. Brown had filed a second report on December 12, 2013, which does not appear to be in the record. E.R. 499. However, this could merely be a reference to her letters to Drs. Sheikh and Hubbly which occurred around that date.

13

medical documentation to support any impairment in Frank's concentration or side effects of medication. E.R. 499. However, due to the difference in opinions between herself and Dr. Sheikh, she said that Liberty "may wish to consider an independent medical evaluation [IME]." E.R. 500.

On July 14, 2014, Frank appealed Liberty's decision to terminate her LTD benefits, arguing that Liberty's review of her claim was not thorough and that she remained disabled under the Policy's definition of the term, entitling her to continued LTD benefits. E.R. 193-98. In support of her argument that she was disabled, Frank stated that the Social Security Administration ("SSA") had determined that she was disabled as of November 9, 2012 and would be awarding her disability benefits effective May 2013. E.R. 193; *see also* E.R. 199-203 (award letter from Social Security Administration). Frank disputed the conclusion of Liberty's Occupational Analysis regarding the description of her role as a Human Resources Manager, arguing that her job as Director of Human Resources at Sodexo "entailed far more high level responsibilities, strategic input, work load, travel and stress than that of a Human Resources Manager." E.R. 193. However, she maintained that she could not even meet the requirements of the occupation of Human Resources Manager, noting that there were psychological demands, such as intervening in company personnel issues, that she could not meet due to her current psychological state, as well as physical demands such as frequent to constant sitting and standing, that her medical records and responses to the activities questionnaire demonstrated that she could not meet. E.R. 194. Frank also rejected Liberty's claim that she had not listed any mental health providers to support her claim of disability due to psychological issues, noting that Liberty had received medical records from Dr. Hubbly, who had been treating her for mental health issues as early as March 2013. E.R. 194-95. She also rejected Liberty's assertion that the

surveillance videos contradicted her self-reported abilities, noting that it was "prolonged sitting" and "bending forward using a computer on a regular basis" that caused her severe pain and that light exercise was recommended by her doctors to improve her condition. E.R. 196. Again, she emphasized the long hours of her previous job, noting that she frequently worked an additional 2-3 hours each evening and over weekends after completing a normal 8-10 hour workday. E.R. 198. Finally, Frank implored Liberty to consider information submitted by Dr. Sheikh and Dr. Hubbly, after Liberty had already decided her claim, which stated that she was still disabled and unable to work. E.R. 198.[13]

On August 25, 2014, Liberty notified Frank that her appeal had been "referred for further medical review and assessment with a physician." E.R. 173. As part of that review, Liberty solicited the opinions of two additional doctors, Dr. Priya Swamy, board certified in physical medicine and rehabilitation, and Dr. Enrique Olivares, board certified in psychiatry, neurology and addiction. *See* E.R. 165-70 and 138-39 (Dr. Swamy's reports); E.R. 140-55 and 121-23 (Dr. Olivares' reports). Dr. Swamy's report indicates that she reviewed Frank's medical records from 2007-2014, the surveillance reports and Dr. Brown's review. E.R. 165-70. She also called Dr. Sheikh and discussed the case on August 25, 2014. E.R. 138.[14] In addition, to assess any potential co-morbidities, she reached out to Dr. Olivares, regarding his opinion of Frank's mental health diagnosis. E.R. 168. Based on the medical evidence before her, Dr. Swamy stated that "[Frank's] diagnoses are lumbar post laminectomy syndrome, cervical disc disease, depression and anxiety, panic disorder, migraine headaches, degenerative knee disease." E.R. 168. She

---

[13] Frank also lists what appear to be new diagnoses, such as a brain tumor and disc bulge. E.R. 195. While distressing, these diagnoses do not relate to the question before the Court as Liberty was evaluating her condition as of December 30, 2013.

[14] Per her request, Dr. Sheikh edited her summary of their conversation, noting that Frank had mental health issues "associated with chronic pain" and her pain behaviors were better characterized as having "difficulty with concentration, anxiety and depression." E.R. 138. However, these edits do not appear to show up in Dr. Swamy's final report, as the letter was sent to Dr. Sheikh the day after the report was written, and Dr. Sheikh's response was sent back three days later. E.R. 138-39.

15

opined that "[Frank] clearly has no difficulty walking for at least 30 minutes, as shown by her walking by the surveillance team." Dr. Swamy concluded that Frank was "capable of full time work," though she recommended an abbreviated work schedule of 4 hours a day for two months, gradually increasing to 8 hours per day, and the use of a standing desk, if desired. E.R. 169. Dr. Swamy opined that "[Frank] repeatedly commented that her job was stressful and she had to work many hours, which appears to be the primary reason she doesn't want to return to work." *Id.*

Dr. Olivares submitted his own assessment of Frank's medical abilities on September 8, 2014, after reviewing Frank's claim, including medical records, Dr. Brown's report and the surveillance footage. As with Dr. Swamy, Dr. Olivares also reached out to Frank's treating physician, Dr. Sussal, and a summary of their discussion was included in a supplemental report. E.R. 121-23. In his detailed fifteen page initial report, summarizing the medical records from Frank's treating physicians, Dr. Olivares opined that "the diagnoses supported by the medical evidence are 311 depressive disorder NOS, 300.00 anxiety disorder NOS, and 309.9 adjustment disorder NOS." E. R. 154. He observed that "[t]he claimant has issues of anxiety and depression in the context of chronic pain; however, there is no evidence of disabling depression, severe or disabling social impairment, ongoing delusions or hallucinations, neurovegetative symptoms of depression, or disabling panic attacks with agoraphobia." *Id.* He opined that her symptoms were "secondary to her medical problems" and not disabling. *Id.* He concluded that there was "no evidence from the medical record of cognitive dysfunction, disabling depression or anxiety that would have rendered her unable to perform the material duties of her job" as of December 30, 2013 and ongoing. *Id.*

When Dr. Sussal responded to Dr. Olivares, he indicated that Frank's diagnosis had changed from adjustment disorder to major depression, and that he had imposed a six month work restriction. E.R. 122. In his supplemental report, Dr. Olivares noted that he disagreed with Dr. Sussal's assessment, finding that "there is no evidence of psychiatric disability and no basis contained in the medical record justifying keeping this claimant out of work for 6 months." *Id.* Dr. Olivares further opined that he stood by his "previous opinion in that there is no evidence of psychiatric disability or the need to impose restrictions or limitations based on the discussion with Dr. Sussal and the additional documentation." E.R. 122.

Based on these reviews, in a letter dated October 28, 2014, Liberty informed Frank that they had completed their review of her application for LTD benefits and affirmed their decision to deny her LTD benefits beyond December 30, 2013. E.R. 112-20. Liberty stated that they did not conduct an Independent Medical Evaluation ("IME") because it would not provide an accurate reflection of her capacity level as of December 30, 2013. E.R. 115.[15]

In her deposition, Dr. Brown reiterated many of the same conclusions written in her reports.[16] Though she admitted that she may have overstated Frank's capacity for "light work," she stood by her original assessment that Frank was capable of "sedentary" work. ECF No. 58-1 at 291. She also re-stated her belief that the video surveillance appeared to be inconsistent with what Frank told her doctors about her abilities. *Id.* at 289.

---

[15] Presumably, this is because any IME would have been conducted seven months after her date of disability, since Frank did not submit her appeal until July 14, 2014, 175 days after the denial of her LTD benefits on January 20, 2014.

[16] Due to its voluminous size, a hard copy of Dr. Brown's Deposition, ECF No. 58-1, Exhibit A, has been filed under seal with the Clerk's office. Pin cites to the deposition refer to the page numbers listed on the document.

## IV.    CONCLUSIONS OF LAW

### A.  Judicial Estoppel

As a threshold matter, the Court must first address Plaintiff's argument that Liberty is judicially estopped from arguing that Frank is not disabled because of Liberty's alleged involvement in the proceedings leading to the Social Security Administration's ("SSA") determination that she is disabled.

Under the Policy, the claimant is incentivized, though not required, to apply for Social Security Disability Insurance ("SSDI"). Specifically, Liberty subtracts from a claimant's LTD benefit award the amount of SSDI that they were eligible to receive, regardless of whether or not they actually received it. E.R. 34-36. The Policy notes that Liberty may assist the claimant in applying for SSDI, E.R. 36, and a letter from Frank to Liberty indicates that Liberty partially reimbursed Frank for the cost of an attorney to represent her for those proceedings. E.R. 176. Frank argues that Liberty was in privity with her, and thus, was a party to the SSA proceedings that determined that she was eligible for SSDI benefits. Because Liberty supported her claim for SSDI in which she took the position that she was disabled, Frank argues they cannot now argue that Frank is not disabled.

To apply the doctrine of judicial estoppel, the following three elements must be present: "(1) [t]he party to be estopped must be asserting a position that is factually incompatible with a position taken in a prior judicial or administrative proceeding; (2) the prior inconsistent position must have been accepted by the tribunal; and (3) the party to be estopped must have taken inconsistent positions intentionally for the purpose of gaining unfair advantage." *King v. Herbert J. Thomas Mem'l Hosp.*, 159 F.3d 192, 196 (4th Cir. 1998).

Here, there is no evidence that Liberty was a party to the prior proceeding or that Liberty asserted any position in a prior proceeding; instead, only Frank and her attorney were present to make any assertions to the administrative law judge. *Peterson v. Int'l Paper Co.*, No. 7:06-CV-48-F, 2009 WL 3379922, at *17 (E.D.N.C. Oct. 20, 2009) is instructive on this point. There, the court found that the application of judicial estoppel was inappropriate because the benefit administrator, despite funding the claimant's application for SSDI, did not make any assertions in the hearing. *See also Mossler v. Aetna Life Ins. Co.*, No. CV 13-01945 SJO MRWX, 2014 WL 3587511, at *17 (C.D. Cal. July 21, 2014) (defendant was not a party in the SSA proceedings and thus did not make any representations in that proceeding at all); *Wical v. Int'l Paper Long-Term Disability Plan*, 191 F. App'x 360, 371 (6th Cir. 2006) ("our general precedents on the doctrine of judicial estoppel do not permit a blanket rule that a plan is estopped from arguing that an employee is not disabled merely because the administrator required or encouraged the employee to apply for [SSDI].")

Implicitly conceding this point, Frank does not argue that Liberty itself made specific assertions in the prior proceeding; instead she claims that Liberty was in privity with Frank, and thus, any representations or assertions that Frank made were also attributable to and binding on Liberty. "Privity does not require 'an exact identity of parties,' rather '[t]wo parties can be said to be in privity when the interests of one party are so identified with the interests of another that representation by one party is representation of the other's legal right.'" *Williams v. Romarm S.A.*, 116 F. Supp. 3d 631, 638 (D. Md. 2015), No. CV TDC-14-3124, 2016 WL 4548102 (D. Md. Feb. 19, 2016) (quoting *Universal Furniture Int'l, Inc. v. Frankel*, 538 F. App'x 267, 270-71 (4th Cir. 2013)). The Fourth Circuit has further identified three categories of non-parties who will be considered in privity with a party in a prior action: "(1) a non-party who controls the

original action; (2) a successor-in-interest to a prior party; and (3) a non-party whose interests were adequately represented by a party to the original action." *Martin v. Am. Bancorporation Ret. Plan*, 407 F.3d 643, 651-52 (4th Cir. 2005) (discussing in the context of applying res judicata).

Frank argues that Liberty was in privity with her because Liberty required her to apply for SSDI benefits; Liberty was entitled to recover a portion of benefits; their interests were aligned in that proceeding; and because of the reimbursement agreement in the Policy, Frank understood that she was acting in a representative capacity on behalf of Liberty. ECF No. 53-1 at 29. First, as stated above, Frank was incentivized but not contractually required to file for SSDI benefits; instead her monthly benefit would be reduced by any potential award that she was eligible to receive. Neither does the Policy appear to reflect Liberty's ability to receive SSDI funds directly, instead the benefit they would receive from Frank becoming eligible for SSDI would be that their monthly obligation to Frank would decrease. However, even accepting Frank's interpretation of the Policy, she fails to establish that Liberty falls into any of the above-mentioned categories of non-parties who may be in privity with a party in a prior action. First, aside from payment of a portion of Frank's attorney's fees, Frank puts forward no evidence that Liberty "controlled the litigation." *C.f. Martin,* 407 F.3d at 652-53 (holding that financing of a suit, alone, is insufficient to warrant application of res judicata to a non-party). Neither has Frank put forward any argument, or pointed the Court to any place in the record that would show that Liberty was Frank's "successor-in-interest" to the SSDI payments. Thus, Frank's argument rests on the third category, which the Fourth Circuit has said should be "defined narrowly" and is inapplicable where "the interests of the parties to the different actions are separate." *Martin,* 407 F.3d at 651. Here, Liberty's interests were not the same as Frank's and therefore were not

20

represented by Frank. If Liberty's interest is defined as minimizing its monetary obligations to Frank, its interest could have been satisfied with either a denial of SSDI payments benefits, suggesting that Frank's disability claim against Liberty was also insufficiently supported, or an award of benefits to Frank, which would represent a deduction in the LTD benefits owed to Frank.[17] Finally, even if privity were to be established, it has not been demonstrated that Liberty was asserting factually incompatible positions in each proceeding. As discussed further below, Social Security determinations are not binding on a determination of benefits eligibility under a private policy because they use different metrics and weigh evidence differently. Thus, there is nothing factually incompatible with presenting the same sets of facts to two different bodies, and with the application of different metrics, arriving at separate conclusions. Liberty is not judicially estopped from presenting arguments that Frank is not disabled under the terms of the Policy.

### B. Frank's Evidence Demonstrating Disability

The Court next turns to the main task at hand, reviewing the evidence in the record to determine whether or not Frank has proven that she is disabled as defined by the Policy. *See Schulte v. Boston Mut. Life Ins. Co.,* No. JKB-14-419, 2015 WL 7273148, at *9 (D. Md. Nov. 18, 2015) ("In other words, it is not Defendant's responsibility to adduce evidence that Plaintiff is not disabled within the meaning of the LTD Policy; it is rather Plaintiff's obligation to prove that she is disabled."). Under the terms of the Policy, Frank must prove that, "as a result of Injury or Sickness, [she] is unable to perform the Material and Substantial Duties of [her] Own Occupation." E.R. 11. These duties are further defined as "the responsibilities that are normally required to perform the Covered Person's Own Occupation and cannot be reasonably eliminated

---

[17] *Milton H. Greene Archives, Inc. v. Marilyn Monroe LLC,* 692 F.3d 983, 996-97 (9th Cir. 2012), on which Plaintiff relies is not persuasive on the issue of privity. In *Marilyn Monroe LLC,* the Ninth Circuit found that privity existed between executors of an estate, one of which was also a 75% beneficiary of the estate, and the limited liability company that housed the assets of the estate. *Id.* This relationship signifies a mutuality of interest not present in the current litigation.

21

or modified." E.R. 13. The Policy specifically notes that this is not evaluated based on Frank's specific job; rather "Own Occupation" is defined as the claimant's trade or profession, "involving Material and Substantial Duties of the same general character as his regular and ordinary employment he was performing when his Disability...began." *Id.*

Based on the vocational analysis conducted on behalf of Liberty, Frank's Own Occupation is that of a Human Resources Manager or Personnel Manager, and includes physical demands classified as "light" or "sedentary." E.R. 543-46. The analysis listed intellectual demands such as overseeing the recruiting of new staff, performing difficult staffing duties such as managing disciplinary problems, working on strategic planning with top executives and advising managers on organizational policy. E.R. 544-46.

Frank posits that the vocational analysis conducted by Liberty is not credible because her job as a Director of Human Resources involved "more high level responsibilities, strategic input, work load, travel and stress than that of a Human Resources manager." E.R. 193. However, Frank's job description provided by Sodexo matches closely to the descriptions of jobs provided in the vocational analysis, which discusses high level responsibilities including consulting with managers on strategic planning and performing difficult staffing duties. E.R. 544-46. Furthermore, where the Policy at issue is "not limited to his job with the employer" it is reasonable for the insurer to look to sources such as the Department of Labor's Dictionary of Occupational Titles ("DOT"), or similar resources, to define the required "material and substantial duties" of Frank's occupation. *See Gallagher v. Reliance Standard Life Ins. Co.,* 305 F.3d 264, 270-71 (4th Cir. 2002) (stating that "[w]here 'regular occupation' is not defined in the Plan, the fiduciary must adopt an appropriate description of the claimant's occupation" and looking to DOT to provide more detail regarding the material duties of the position). To be

applicable, a description must "involve comparable duties but not necessarily every duty." *Id.* at 272 (citation omitted). Frank's counsel submitted a letter on this issue, bringing the Court's attention to a recently decided case, *Sapp v. Liberty Life Assurance Co. of Boston*, No. 1:16-CV-105, 2016 WL 5660449 (E.D. Va. Sept. 28, 2016). In *Sapp*, the court found that the vocational analysis was inapplicable because the plaintiff's job required significantly more physical demands than were included in the DOT job description relied on by the insurer. *Id.* at *5. Because the Court finds that the vocational analysis presented here does substantially match Frank's job description, the holdings in *Sapp* are inapposite.

As Frank has put forward a number of additional arguments to support her claim, the Court has grouped her arguments thematically and will consider each in turn.

### 1. Social Security Administration's Finding of Disability

Frank puts significant emphasis on the fact that SSA determined that she was eligible to receive disability benefits, stating that "the SSA determination effectively establishes the issue" because both the Policy and SSA look to see whether or not Frank could perform the duties of her own occupation. *See* ECF No. 53-1 at 27-28. But in *Smith v. Cont'l Cas. Co.*, the Fourth Circuit repeatedly emphasized the difference between SSA decisions and an insurance company's determination of a claimant's eligibility for LTD benefits under a private benefit plan, stating "what qualifies as a disability for social security disability purposes does not necessarily qualify as a disability for purposes of an ERISA benefit plan—the benefits provided depend entirely on the language in the plan." *Smith v. Cont'l Cas. Co.*, 369 F.3d 412, 420 (4th Cir. 2004). Other courts in this district have made similar observations, opining that "the mere fact that certain agencies have, per their own regulations and procedures, deemed Plaintiff disabled, does not establish that Plaintiff is disabled within the meaning of Defendant's Policy."

*Schulte*, 2015 WL 7273148, at \*9 n.21. Furthermore, where, as is the case here, the SSA award letter merely notifies Frank of her entitlement to benefits, but does not explain the basis for the administrative law judge's decision, the determination is less persuasive because it provides no insight into the judge's reasoning. *See Leppert v. Liberty Life Assurance Co. of Boston*, No. 16-3387, 2016 WL 6958641, at \*9 (6th Cir. Nov. 29, 2016) (unpublished) (finding that "under existing Social Security regulations, [plaintiff] could have been awarded benefits for a variety of reasons" including factors outside the bounds of the benefit plan).

In addition, Liberty does not hide from the fact that SSA reached a different conclusion, stating in its final denial letter that SSA follows different medical and vocational rules than Liberty, specifically noting that SSA affords "special deference to the opinion of a treating physician over the opinion of a non-treating physician," which Liberty is not required to do. E.R. 119. Furthermore, Liberty stated that their decision was based on additional clinical and medical reviews that were not considered by SSA. *Id.* Thus, the Court finds that SSA's determination that Frank is eligible for SSDI, without an explanation of the findings underlying their decision, does not prove that Frank is disabled under the terms of the Policy.

### 2. Analysis of Frank's Medical Condition

The crux of this case is whether or not Frank is disabled under the terms of the Policy, as shown by an inability to fulfill the material and substantial duties of her own occupation. Therefore, a thorough review of the opinions of trained medical staff regarding Frank's abilities is essential to the fair resolution of this case. As this case is being decided pursuant to Federal Rule of Civil Procedure 52, "the judge sits as finder of fact and is empowered to evaluate the evidence, determine the credibility of witnesses, and draw whatever reasonable inferences the judge deems appropriate given his factual findings." *Weisner*, 192 F. Supp. 3d at 608 (citing

*Inv'rs Title Ins. Co.*, 296 F. App'x at 333). The evidentiary record contains analyses of Frank's medical condition from both the perspective of her personal physicians and from doctors who reviewed Frank's claim file upon Liberty's request.

As noted above, the Social Security Administration has adopted a rule wherein the opinions of an individual's treating physicians are given special deference when determining eligibility for SSDI. The Supreme Court specifically rejected that rule in *Black & Decker Disability Plan v. Nord*, holding that in contrast to administrative law judges making SSDI determinations, in the context of employee benefit plans governed by ERISA, "plan administrators are not obliged to accord special deference to the opinions of treating physicians." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825 (2003). Instead of preferencing either the opinion of the treating physician or the claim reviewer, each with their own incentives and biases, the Supreme Court advocated an analysis of the strength of the opinion itself, taking into consideration factors such as the physician's expertise in the field and the length of time they spent treating the patient. *Id.* at 832.

Subsequent cases have provided further guidance for how to weigh competing medical opinions when evaluating a denial of benefits claim. In *Neuman*, the court placed greater weight on the opinions of doctors who had actually evaluated the patient in-person, whether it be the claimant's personal physician or an independent medical evaluation conducted at the request of the insurer, finding that such doctors had a better ability to opine on the veracity of the plaintiff's reported symptoms. *Neumann*, 367 F. Supp. 2d at 990; *see also Brainard v. Liberty Life Assurance Co. of Boston,* 173 F. Supp. 3d 482, 488 (E.D. Ky. 2016) (stating in-person evaluation especially useful for mental illness diagnosis due to subjective nature of disease). In *Bilheimer,* the Fourth Circuit reached a similar conclusion, noting that the opinions of doctors who

conducted a claim review were unpersuasive because they did not evaluate the patient themselves or speak to the treating physician about their diagnosis. *See Bilheimer v. Fed. Exp. Corp. Long Term Disability Plan*, 605 F. App'x 172, 182 (4th Cir. 2015). In other cases, the Fourth Circuit emphasized the need for an insurance company's claim reviewers to analyze and distinguish their opinion from the opinion of the treating physician, when arriving at different conclusions. *See e.g. Gorski v. ITT Long Term Disability Plan for Salaried Employees*, 314 F. App'x 540, 547 (4th Cir. 2008); *Frankton v. Metro. Life Ins. Co.*, 432 F. App'x 210, 216 (4th Cir. 2011). Finally, courts have highlighted the need for medical opinions to address the determinative issues in denial of benefits cases by tying their analysis of the patient's medical condition to the patient's ability to perform their own or any occupation. *See e.g. Sabatino v. Liberty Life Assurance Co. of Boston*, 286 F. Supp. 2d 1222, 1232 (N.D. Cal. 2003) ("Liberty argues that the medications taken by Plaintiff are not disabling because Plaintiff can perform sedentary work. Inability to perform sedentary work is not the definition of disability set forth in the policy. The relevant definition of disabled in the policy is 'unable to perform all of the material and substantial duties of his occupation on an Active Employment basis because of an Injury or Sickness.'"); *Weisner*,192 F. Supp. 3d at 616-17 (D. Md. 2016) ("Cumulatively, then, the evidence corresponding to the particularized impact of Plaintiff's medical conditions on his ability to perform his material and substantial duties is tenuous."); *Panther v. Sun Life Assurance Co. of Canada*, 464 F. Supp. 2d 1116, 1122 (D. Kan. 2006) ("At the very least, [the insurer] should have required Dr. Ghanayem to specifically evaluate whether [plaintiff] was capable of prolonged periods of walking and standing, since these were listed as material and substantial duties…").

With these principles in mind, the Court will analyze the evidence regarding Frank's abilities.[18] Her medical issues can be grouped into two categories: psychiatric and physical. The Court will address each category in turn.

*Psychiatric Issues*

Frank states that she suffers from major depressive disorder, panic disorder, anxiety disorder and insomnia. ECF No. 53-1 at 2. In support of this claim, she references medical opinions from Dr. Hubbly, her general practitioner, Dr. Sussal, her psychiatrist, and Randee Weiss, a licensed social worker. Frank's first visits with Dr. Sussal and Ms. Weiss were on June 13, 2014 and June 19, 2014 respectively. E.R. 398; E.R. 241. Liberty denied her LTD benefits as of December 30, 2013, stating that she no longer met the Policy's definition of disability at the time. The Policy states that the monthly benefit will cease on "the date the Covered Person is no longer disabled according to this policy." E.R. 38. Thus, the Court's analysis will focus on Frank's abilities as of December 30, 2013, the point at which Liberty first determined that she was no longer disabled, and thus, no longer eligible to receive LTD benefits.

Having decided that December 30, 2013 is the relevant date at issue, the opinions of Dr. Sussal and Ms. Weiss fail to support Plaintiff's claim that she was disabled as of that date

---

[18] Frank repeatedly argues that Liberty improperly required Frank to provide objective evidence of her diagnosis, claiming that no such requirement was present in the Policy. *See* ECF No. 53-1 at 31-33. Under *de novo* review, the Court will consider all evidence in the record that could permissibly be submitted under the terms of the Policy and under the Federal Rules of Evidence. Here, the Policy states that "proof" of a claimant's injury or sickness "may include…(3) the provision by the attending Physician of standard diagnosis, chart notes, lab findings, test results, x-rays and/or other forms of objective medical evidence in support of a claim for benefits." E.R. 14. As the Policy does not limit proof to only objective evidence, subjective evidence may be considered. The Fourth Circuit recently approved a district court's reasoning on how to weigh subjective evidence when such evidence is not specifically addressed in the Policy. The district court held,

Where the plan documents do not provide a procedure for dealing with disability claims based on subjective complaints of pain, a plan administrator employing a principled reasoning process need not simply accept a claimant's subjective complaints of pain without question, especially if there is other conflicting information in the record. Neither, however, can a plan administrator in such a situation simply dismiss such subjective complaints of pain out of hand, especially where there is objective medical proof of a disease that could cause such pain.

*See DuPerry v. Life Ins. Co. of N. Am.*, 632 F.3d 860, 868 (4th Cir. 2011). The Court will use this same framework in its analysis.

because their first appointments with her did not occur until approximately six months later. *See Dunbar v. Orbital Scis. Corp. Grp. Disability Plan,* 265 F. Supp. 2d 572, 587 (D. Md. 2003) ("Medical reports prepared substantially after the relevant date of disability are of little relevance in determining whether a claimant is disabled."); *see also Starnes v. Gen. Elec. Co.,* 201 F. Supp. 2d 549, 557 (M.D.N.C. 2002)("Furthermore, it was likewise reasonable for the Disability Center to determine that Dr. Monroe's evaluation on July 23, 1999 did not support Plaintiff's claim that he became disabled in April, 1999, because without having evaluated Plaintiff in April, 1999, Dr. Monroe had no way to know what Plaintiff's condition might have been at that time."). Simply put, it is not possible to know whether the factors leading to diagnoses made in June 2014 existed on December 30, 2013. Therefore, the Court will focus on the opinions of Dr. Hubbly, who examined Frank regularly between January 2013 and January 2014 and thus had multiple opportunities to observe her during the relevant time frame. E.R. 380.

Dr. Hubbly routinely lists diagnoses of insomnia, anxiety and depression in his notes after his appointments with Frank. *See e.g.* E.R. 381 (describing visit on January 23, 2014); E.R. 385 (describing visit on October 14, 2013). Yet, his only statements regarding a disability are in reference to Frank's back pain. *See* E.R. 381. In addition, his assessments of Frank during their appointment do not include any descriptions of a disabling mental illness. Instead, his comments include statements such as "normal mood and affect, well appearing, well-nourished, in no distress." *See. e.g.,* E.R. 385 (describing visit on October 14, 2013). In addition, he wrote on December 20, 2013, that Frank "does not want to be treated with anti-depressant at this time…" E.R. 384.

While this Court does not doubt the veracity of Frank's diagnoses of anxiety, depression and insomnia, these illnesses can present in a wide range of severity and there is no evidence in

the record that she suffered from these illnesses to an extent which would prevent Frank from

fulfilling the material and substantial duties of her own occupation. In addition, Frank's

reluctance to continue receiving treatment for her depression suggests that even if her mental

illness was disabling, Liberty could still terminate her benefits because the Policy states that

LTD benefits can be terminated for "refus[ing] to receive Appropriate Available Treatment."

E.R. 38.

In support of their argument that Frank was not disabled by any psychiatric condition,

Liberty submits the opinion of Dr. Olivares, board certified in psychiatry, neurology and

addiction. E.R. 140-55 and 121-23. Dr. Olivares reviewed Frank's medical files, including the

opinions of Dr. Hubbly and Dr. Sussal and concluded that while "[t]he claimant has issues of

anxiety and depression in the context of chronic pain;…there is no evidence of disabling

depression, severe or disabling social impairment, ongoing delusions or hallucinations,

neurovegetative symptoms of depression, or disabling panic attacks with agoraphobia." E.R. 154.

While he did not examine her personally, he did reach out to Dr. Sussal to discuss Dr. Sussal's

diagnosis and explained in his report why he disagreed with Dr. Sussal's opinion.[19]

While, as mentioned, *supra*, the opinion of a non-treating physician is typically

disfavored when dealing with diseases that have subjective components such as mental illness,

here, the opinions of the treating physicians do not provide the type of detail that lends them

greater credence. Dr. Hubbly provides only general diagnoses and does not include any evidence

to suggest that Frank is disabled by any psychiatric disorder. Similarly, Dr. Sussal's

appointments with Frank, more than a half a year after the relevant date of disability, are not

---

[19] There is no evidence in the record regarding why Dr. Olivares did not reach out to Dr. Hubbly.

persuasive.[20] Thus, the Court finds the Frank has not presented sufficient evidence to show that she was disabled due to psychiatric issues.

*Physical Issues*

In support of her claim of physical disability, Frank submits medical records and diagnoses from Dr. Mandel, an orthopedic specialist, Dr. Hubbly, and Dr. Sheikh, a pain management specialist. Dr. Mandel appears to be the first doctor Frank interacted with, treating her from November 2012 through at least November 2013. *See* E.R. 924; E.R. 214. In his first letter to Liberty, Dr. Mandel stated that Frank suffered from lumbar radiculopathy, a diagnosis which appears to be supported by an MRI of her spine[21] and a physical exam, but predicted that with physical therapy, Frank could return to work on January 7, 2013. E.R. 903, 924. In subsequent visits, Dr. Mandel continued to prescribe "no work" even though by March 2013, Frank's self-reported pain had decreased from an initial 10/10 to 6/10 and he had initially predicted a short-recovery. Despite this apparent improvement in Frank's condition and Dr. Mandel's notation that physical therapy had been helpful, on March 13, 2013, he stated that she is "permanently disabled due to her underlying disease." E.R. 793-94. This sweeping conclusion is reached without any apparent discussion of the specific limitations that might prohibit Frank from performing the material and substantial duties of her job, besides limited lumbar movement and the associated pain, and without acknowledgement of the positive improvements to her condition that he noted in the very same visit. Dr. Mandel's final assessment on November 13,

---

[20] Dr. Sussal's assessments of Frank as of September 2014 show a decline in mental health, as evidenced by his observation that "she had stopped caring for self via Hygiene." E.R. 104. While unfortunate, this actually supports the idea that she was not suffering from a disabling mental illness during the relevant period as there was no mention of any such outward manifestations of illness, such as lack of personal hygiene, from Dr. Hubbly.

[21] The MRI analysis can be found at E.R. 904.

2013 again states that she is "permanently disabled and cannot work" but does not provide any reason for how he reaches this conclusion.[22] E.R. 214.

Next, Frank presents the conclusion of Dr. Hubbly, her general practitioner. Dr. Hubbly treated Frank from January 23, 2013 through January 23, 2014. E.R. 380. From the notes discussing his appointments with Frank, Dr. Hubbly does not appear to have diagnosed Frank himself, instead relying on Frank's statements regarding Dr. Mandel's diagnosis. *See e.g.* E.R. 383 ("since last visit she has seen orthopedic specialist Dr. Mandell and has been diagnosed with lumbar radiculopathy."); E.R. 381 ("per patient has been evaluated by orthopedic surgeon and has been deemed permanently disabled."). From the record before the Court, it is unclear if Dr. Hubbly ever conferred with Dr. Mandel or examined the MRIs of her back himself. His own evaluation of Frank appears to be limited to recording her self-reported comments of an inability to sit for more than 15 minutes, E.R. 383, along with objective assessments such as "unable to sit up without assistance; unable to lift [both legs] beyond 30 degrees due to pain, lower lumbar tenderness," E.R. 383, or "posture is bent due to back pain; difficulty getting on exam table." E.R. 381. On a form submitted to Liberty on January 23, 2014, he states that Frank is "not able to work," "is disabled" and "will not be able to work. permanently disabled." E.R. 380.[23] At no point does Dr. Hubbly explain his diagnosis of permanent disability, or how Frank's limitations are linked to her ability to perform the material and substantial duties of her job.

Finally, Frank puts forward the analysis of Dr. Sheikh, a specialist in pain management. Dr. Sheikh treated Frank from August 5, 2013 through at least May 2014. E.R. 219. At their

---

[22] While Dr. Mandel also appears to mention knee pain, his diagnosis of disability appears to refer only to the back pain.

[23] Casting doubt on the reliability of this statement is that fact that Dr. Brown, one of Liberty's clinicians, stated that she had a conversation with Dr. Hubbly six weeks earlier on December 12, 2013, where he stated that he "agreed that Ms. Frank could perform sedentary work, as required of her occupation, if her pain is controlled." E.R. 522.

January 2, 2014 appointment, Dr. Sheikh appears to have completed a physical exam, noting pain in the lumbar spine area and limited range of motion. E.R. 352. He also reviewed with Frank a recent MRI of her knee related to knee pain. E.R. 353. Dr. Sheikh is the only doctor who appears to have engaged with Frank regarding her ability to work. On that date he notes that he discussed a return to work with her but that even sedentary work would be difficult because she "is not able to sit without pain for long periods of time, and position changes at will are not a possibility due to the nature of the work (attending meetings, conferences, phone etc.). Patient is also dependent on pain medications for pain control and is not able to function at the highest cognitive level (which is needed for her work) due to [central nervous system] side effects of medications." E.R. 353. On January 23, 2014, Dr. Sheikh submitted a letter to Liberty, indicating that Frank could not perform full time sedentary work, even with allowance for position change. E.R. 504. He stated that "she was unable to do [full-time sedentary work] at this time due to chronic pain which does not allow her to sit. Also difficulty concentrating due to chronic pain and side effect from medication which she needs to take." *Id.* He recommended that she avoid prolonged sitting, heavy lifting and excessive bending or twisting. *Id.* Finally, he noted that Frank's pain was "somewhat controlled" at this time but "still functionally limiting." *Id.*

In opposition to the opinions of Drs. Mandel, Hubbly and Sheikh, Liberty submits the reports of Drs. Brown and Swamy, along with surveillance footage taken of Frank.

In preparing her report, Dr. Brown reviewed the occupational analysis; Frank's activities questionnaire; investigative reports, including video from surveillance that Liberty had conducted on Frank; notes from Frank's treating physicians including Dr. Mandel, Dr. Hubbly and Dr. Sheikh, regarding their treatment of Frank from November 12, 2012 through September 12, 2013; and diagnostic test results. E.R. 536. Based on this review, Dr. Brown concluded that

"the reviewed medical and functional documentation does not support functional impairment related to the insured's chronic low back and lower extremity complaints...." and that "the insured remains physically capable of full-time sedentary and light-work, as defined by the US Department of Labor." E.R. 537. She further found that, aside from effects on her intestinal system, there were no confirmed functional or cognitive limitations due to her medication use. *Id.* She spoke with Dr. Hubbly and Dr. Sheikh regarding their assessment of Frank's abilities and drafted an updated report addressing Dr. Sheikh's comments, reflecting the type of engagement with a claimant's treating physician that the Fourth Circuit has urged. *See Gorski*, 314 F. App'x 540 at 547. In her updated report, she stated that Dr. Sheikh provided "no functional or medical evidence" to support his opinion that Frank could not perform work, and no medical documentation supporting impaired concentration or reported medication side effects. E.R. 499. In her deposition, she elaborated on the type of detail Dr. Sheikh could have provided, noting that, for example, if Frank was complaining of numbness and tingling in the legs, "he could provide an exam or send her for an EMG...to validate those complaints." ECF No. 58-1 at 318. In terms of cognitive side effects, she opined that there was no evidence that Frank was taking all of the drugs she was prescribed that could cause such effects, noting that a drug screen that Dr. Sheikh conducted only showed evidence of Frank using Flexeril, the muscle relaxant. *Id.* at 313. Moreover, Dr. Sheikh had prescribed a low dosage of pain medication and noted that "you tend not to have significant cognitive issues related to – to those things at lower doses." *Id.*

When Frank appealed her denial of LTD benefits, Liberty solicited a second opinion regarding her physical impairments from Dr. Swamy. Dr. Swamy's report indicates that she reviewed Frank's medical records and reached out to Dr. Sheikh to discuss his diagnosis. E.R. 165-70. Dr. Swamy agreed with the diagnosis of Frank's medical condition, but opined that

Frank was "capable of full time work," though she recommended an abbreviated work schedule of 4 hours a day for two months, gradually increasing to 8 hours per day, and the use of a standing desk, if desired. E.R. 168-69. Despite her stated disagreement with Dr. Sheikh's conclusions, Dr. Swamy does not provide significant detail for why she reached a different conclusion. She notes that based on surveillance, Frank can walk for at least 30 minutes and that the restrictions imposed by Frank's other doctors still allow Frank to grip, engage in overhead activities and lift 10-25 pound weights. E.R. 169.[24] However, she fails to engage in any analysis of how Frank's diagnoses impact her ability to complete the material and substantial duties of her own occupation.

From the evidence presented, it is clear that both sides agree on the fact that Frank suffers from pain in her back, legs and knees. However, they disagree on the extent to which that pain renders her disabled under the terms of the Policy. The Court finds that the medical opinions submitted by Plaintiff are unpersuasive. Dr. Mandel's conclusion that Frank was permanently disabled is superficial and fails to supply the reasoning behind his conclusion. Furthermore, his statement comes on the same day he notes improvements in her condition, without acknowledging or addressing this seeming contradiction. Dr. Hubbly's analysis is similarly cursory and unpersuasive. His objective evaluation of Frank's abilities appears to be limited to observing her inability to do activities such as lifting her legs or getting on an exam table, activities that she would not be required to do to perform the material and substantial duties of her job. Dr. Sheikh is the only doctor identified by Plaintiff who appears to have engaged in a

---

[24] The Fourth Circuit has cast doubt on the probative impact of videotape surveillance when it contradicts medical opinions, concluding that videos showing an individual engaging in activities "for a relatively short time with no apparent discomfort does not cast significant doubt on the opinions of [the claimant's] physicians that [the claimant] was not physically able to work for a sustained period of time." *Gorski v. ITT Long Term Disability Plan for Salaried Employees*, 314 F. App'x 540, 549 (4th Cir. 2008). Here, however, the surveillance is supported by Dr. Brown's opinions and the Court does not find the contrary views of Frank's doctors to be persuasive.

robust physical examination of Frank and discussed, at least once, how her limitations impact her ability to perform her job. However, Dr. Sheikh's analysis is ultimately flawed because, by looking at the limitations of Frank's current job, he does not address the ultimate question in this case - can Frank perform the material and substantial duties of her own occupation? Dr. Sheikh notes that Frank stated that "position changes at will are not a possibility due to the nature of the work (attending meetings, conferences, phone, etc.)." E.R. 353. However, while those may have been the then-current realities of Frank's job at Sodexo, it is reasonable to think that Frank could perform work as Director of Human Relations at Sodexo or elsewhere that could have accommodated her need for position changes. The Court additionally notes that the Policy does not require Frank to be able to engage in full time work, disability coverage ceases under the terms of the Policy when a covered person is able "to work in his Own Occupation on a part-time basis, but chooses not to." E.R. 38.

As it is Plaintiff's burden to put forward evidence of disability, her failure to do so is decisive. However, the Court finds that the report by Dr. Brown offers additional support for its finding that Frank is not disabled within the terms of the Policy. After a review of Frank's medical records and conversations with two of her treating physicians, Dr. Hubbly and Dr. Sheikh, Dr. Brown concluded that "the reviewed medical and functional documentation does not support functional impairment related to the insured's chronic low back and lower extremity complaints...." and that "the insured remains physically capable of full-time sedentary and light-work, as defined by the US Department of Labor." E.R. 537. She further found that, aside from effects on her intestinal system, there were no confirmed functional or cognitive limitations due to side effects from medications. *Id.* She noted that she disagreed with Dr. Sheikh's assessment because he did not include any functional or medical evidence to support his opinion. Dr. Brown

does not appear to dismiss Frank's subjective statements regarding her level of pain out of hand, rather, and in contrast to Dr. Sheikh, she believes that such pain can be alleviated by "allowance for position change [sit/stand/sit]...." E.R. 500.

Frank's accusations that Dr. Brown is not credible are not supported by the evidence in the record. A review of her deposition testimony shows someone who is comfortable with her opinions and not evasive as she reaffirms her original assessments. Finally, while Dr. Brown does indeed receive significant financial remuneration from Liberty, without more, this does not mean that her opinions lack merit. Because Plaintiff has failed to meet her burden, judgment will be entered for the Defendant.

## V.    CONCLUSION

For the foregoing reasons, Defendant's Motion for Judgment, ECF No. 59, is granted and Plaintiff's Motion for Judgment, ECF No. 53, is denied. A separate Order follows.

Dated: March / , 2017

GEORGE J. HAZEL
United States District Judge